# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**HERBERT M. HALDEMANN, JR.,**
      Petitioner,

v.                                         Case No. 10-C-0869

**ANA BOATWRIGHT, Warden,**
New Lisbon Correctional Institution,
      Respondent.

---

### DECISION AND ORDER

Herbert M. Haldemann, Jr., has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. He was convicted in Waukesha County, Wisconsin, of one count of second-degree sexual assault with use of force. He was sentenced to twenty years of initial confinement followed by seven years of extended supervision. For the reasons explained below, his request for habeas relief will be denied.

### I. BACKGROUND

The Wisconsin Court of Appeals described the background to Haldemann's conviction as follows:

> Haldemann and Dana P. met in August 2003. They began living together and, in the summer of 2004, they moved to an apartment in Menomonee Falls. They had a son together, who was born that September. Haldemann and Dana continued to live together until October 2005, when Dana moved back to the Green Bay area. Dana took their son with her when she left. Both Haldemann and Dana participated in court proceedings to establish custody and placement of their son. The court ordered placement with Haldemann every other weekend, Thursday through Sunday.
>
> Over the next several months, Dana received "harassing phone calls nonstop every single day" from Haldemann. During these calls, Haldemann would try to convince Dana to return, to allow him additional placement time, and to tell him whom she was seeing and what she was doing. In response

to these phone calls, Dana obtained a restraining order against Haldemann. The court ordered Haldemann to stop the harassing phone calls, but did not prohibit contact between Haldemann and Dana for purposes of arranging drop off or pick up of their son. Haldemann did not stop calling and Dana reported violations of the restraining order many times.

Haldemann had placement of his son the weekend of July 29, 2006, and normally placement would have ended that Sunday evening. However, Dana and Haldemann agreed that Dana would pick up their son on Monday morning. Around 4:30 a.m. on Monday, Dana called Haldemann twice, stating she could not sleep and would come down early. Haldemann agreed to leave the door open for her so she could enter the apartment when she arrived.

From this point forward, the parties presented very different stories at trial. Dana testified that when she arrived at Haldemann's, she went into the bedroom and sat next to her son, who was in the bed with Haldemann. Haldemann attempted some physical contact with Dana, but she rebuffed him. Haldemann stated that he needed to bathe and feed the boy before they could leave. Dana went to sit on the couch and wait. Eventually, she told Haldemann that she would not wait any longer and she wanted to leave. Haldemann blocked the door and would not let her go. Dana attempted to leave, but Haldemann grabbed her wrists and threw her backwards onto the couch. Dana fought back, but Haldemann told her he would not let her go unless she had sex with him or gave him "100 percent custody" of their son. Dana continued to fight, but Haldemann held her down, removed her jogging pants, and forced her to have sexual intercourse.

Haldemann then carried Dana into the bedroom, threw her on the bed and told her to remove her shirt. She refused and Haldemann told her that if she would not take off her shirt, he would "cut it off for [her]." Haldemann then produced a knife, with the blade open, from the side table. Dana testified that when she saw the knife, she "didn't know if he was going to kill [her] or what he was going to do," so she stopped resisting. Haldemann had sexual intercourse with Dana again. Afterward, he noticed she was bleeding and gave her a towel. Dana dressed, but Haldemann would not let her leave because he feared she would go to the police. After about two hours, Dana convinced Haldemann that she would not go to the police, and Haldemann let her leave with their son.

Dana called her mother on the way back to the Green Bay area. They arranged to meet in Green Bay and Dana's mother accompanied her to the hospital. While she was driving, Dana received numerous calls from Haldemann. She estimated that he called as many as fifty times, but she did not pick up the phone. Haldemann left several voice mail messages for

2

Dana. Dana explained that she dialed Haldemann's number once by accident during the drive, but ended the call as soon as she realized her mistake.

In Green Bay, Dana met with a Menonomee Falls detective who had come to speak with her at the hospital. She was then examined by a Sexual Assault Nurse Examiner (SANE), Susan Robertson. Robertson took a statement from Dana and performed a physical exam. She observed two sets of recent scratches on Dana, one on her back and one on her right breast. She also observed signs of "blunt force or squeezing" on Dana's left breast, in the pattern of fingerprints. Robertson opined that "in a day or two this would be a very bruised area." Robertson performed a pelvic exam, which revealed redness and swelling of the hymen, and blood from the cervix and vagina. At trial, Robertson testified that her findings regarding Dana's physical injuries were consistent with nonconsensual sexual intercourse.

Haldemann's version of the events of July 31, 2006, is quite different. He recalls the 4:30 a.m. phone call from Dana saying that she would be at his apartment early that morning. She arrived about two hours later and came into the apartment bedroom. Haldemann remembers Dana getting into the bed and cuddling before he rose to bathe and feed his son. Afterward, Haldemann asked Dana if she would like to have sex and she said yes. Haldemann denies that Dana resisted in any way, and denies having threatened her with a knife.

After sex, Haldemann made a comment about Dana's current boyfriend that he believes prompted a violent response from Dana: "[S]he didn't like what I had to say, and she jumped up and hit me in my crotch. And I shoved her with both hands, the palms of my hand back onto the couch." Haldemann forbid Dana to leave because he believed her car was not safe for his son to ride in, so he attempted to keep her there until he could fix it. Dana eventually left without having the car fixed.

At trial, there was no dispute that sexual intercourse occurred; rather, the sole issue was consent. The jury determined that Dana had not consented to sexual intercourse and found Haldemann guilty of second-degree sexual assault.

State v. Haldemann, No. 2008AP929-CR, 2009 WL 2032346 (Wis. Ct. App. July 15, 2009).

Following his conviction, Haldemann filed a motion for post-conviction relief in the trial court. He argued that he had not received effective assistance of counsel and that the state had violated its statutory duty to disclose certain evidence that it planned to use

against him at trial. The trial court held a hearing on the motion and then denied it. Haldemann appealed to the Wisconsin Court of Appeals, which affirmed. Haldemann then sought review in the Wisconsin Supreme Court, but that court denied his petition for review.

Following the conclusion of direct review of his conviction, Haldemann, now proceeding pro se, filed a post-conviction motion in the trial court under Wis. Stat. § 974.06. In that motion, Haldemann raised a number of issues that he did not raise on direct appeal. He asserted in his motion papers that he instructed his appellate counsel to raise those issues on direct appeal, and that despite his instructions his counsel did not do so. The trial court denied the post-conviction motion, and Haldemann did not appeal. Instead, he filed the present habeas action.

## II. DISCUSSION

### A. Procedural Default & Cognizable Claims

In his petition, Haldemann sets forth thirty-eight numbered paragraphs presenting various grounds for relief. However, the only grounds that Haldemann raised on direct appeal are the following: (1) his trial counsel was ineffective in two respects—he performed deficiently by not consulting an independent nurse to review the findings of Nurse Robertson, and he performed deficiently by not seeking to admit evidence concerning Dana's sexual activity on the night before the alleged assault; (2) the prosecutor violated Wisconsin law by failing to disclose certain evidence (which consisted of voicemails that Haldemann left for Dana after the incident and photographs of bruises on Dana's body) prior to trial.

4

Respondent argues that Haldemann has procedurally defaulted all grounds raised in his petition other than those that he raised on direct appeal. A habeas petitioner is required to assert his federal claims through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings. See, e.g., Lewis v. Sternes, 390 F.3d 1019, 1025 (7th Cir. 2004). This means that the petitioner must raise his claims at each and every level in the state-court system. Id. A habeas petitioner who has exhausted his state-court remedies without properly asserting his federal claims at each level of state-court review has procedurally defaulted those claims. Id. at 1026. A procedural default will bar federal habeas relief unless the petitioner can demonstrate both cause for and prejudice stemming from that default, or that the denial of relief will result in a miscarriage of justice. Id.

In the present case, although petitioner did raise in a post-conviction motion many of the claims that he did not raise on direct appeal, he did not appeal the denial of that post-conviction motion to either the Wisconsin Court of Appeals or the Wisconsin Supreme Court. Thus, he has not asserted those claims through one complete round of state-court review. Moreover, it does not appear that Haldemann could assert those claims in either the Wisconsin Court of Appeals or the Wisconsin Supreme Court at this time. Therefore, Haldemann has procedurally defaulted those claims.

Haldemann argues that he has cause for the procedural default—namely, his appellate counsel's failure to raise the claims he told him to raise on direct appeal. However, counsel's failure to raise a claim can serve as cause for a procedural default only if counsel's failure to do so constitutes ineffective assistance of counsel. See Murray v. Carrier, 477 U.S. 478, 488-89 (1986). And before a habeas petitioner can ask a federal

5

court to set aside a procedural default based on ineffective assistance of counsel, the petitioner must exhaust that ineffective-assistance claim in state court. Id. In the present case, Haldemann has not exhausted an ineffective-assistance-of-appellate-counsel claim in state court, and so he cannot use any such ineffective-assistance claim as cause for setting aside the procedural default of his other claims.

As for the claims that Haldemann did exhaust during his direct appeal, respondent concedes that the claims involving ineffective assistance of trial counsel can be addressed on the merits in this habeas proceeding. However, respondent contends that the claim involving the prosecutor's failure to comply with its discovery obligations under Wisconsin law does not involve a federal issue and therefore is not cognizable in this proceeding. See, e.g., Perruquet v. Briley, 390 F.3d 505, 511 (7th Cir. 2004) ("The remedial power of a federal habeas court is limited to violations of the petitioner's federal rights, so only if a state court's errors have deprived the petitioner of a right under federal law can the federal court intervene."). Petitioner recognizes that to the extent his claim involves errors of state law it is not cognizable. However, he contends that the claim has a federal component because it implicates the prosecutor's duty to disclose exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963). But when Haldemann raised this claim in the state courts, he did not frame it as a violation of the prosecutor's constitutional duty to disclose exculpatory evidence. Rather, he relied exclusively on Wisconsin Statute § 971.23, which imposes pretrial discovery obligations on the parties that are not required by Brady. Indeed, in its response brief in the Wisconsin Court of Appeals during Haldemann's direct appeal, the state asserted that "[t]he prosecutor's constitutional duty to disclose exculpatory evidence under [Brady] is not at issue," see Answer Ex. C at 30 n.4, and

6

Haldemann did not dispute that assertion in his reply brief.  Accordingly, petitioner did not exhaust a Brady claim in state court, and so any such claim has been procedurally defaulted.[1]

## B. Merits of Non-Defaulted Ineffective-Assistance Claims

Because the Wisconsin Court of Appeals adjudicated Haldemann's non-defaulted ineffective-assistance claims on the merits, the standard of review in 28 U.S.C. § 2254(d) applies.  Therefore, I may grant habeas relief only if the court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The Supreme Court precedent relevant to the present case is Strickland v. Washington, 466 U.S. 668 (1984), and related cases governing claims of ineffective assistance of counsel.  To prevail on an ineffective-assistance claim, Haldemann must show that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense.  Id. at 689-92.  To show that counsel's deficient performance prejudiced his defense, Haldemann must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 694.

Haldemann first argues that his trial counsel should have consulted with an expert witness regarding Nurse Robertson's conclusion that Dana's injuries—scratches, bruises,

---

[1] I also note that Brady requires a prosecutor to disclose exculpatory evidence, and that the evidence at issue in the present case was not exculpatory.  Indeed, it was the prosecutor who introduced the disputed evidence at trial.  Thus, if Haldemann had not defaulted his Brady claim, I would have denied it on the merits.

7

redness and swelling of the hymen, and blood from the cervix and vagina—were consistent with nonconsensual sex. When Haldemann raised this claim in his first post-conviction motion, the trial court held a hearing (a "Machner" hearing, see State v. Machner, 92 Wis. 2d 797 (Ct. App. 1979)) on the claim. At the hearing, Haldemann presented the testimony of another nurse, Debra Donovan, who opined that Robertson's conclusion was not accurate. In Donovan's opinion, the observed injuries could have been caused by consensual sex, and therefore the existence of the injuries did not corroborate Dana's version of events. Haldemann's trial attorney also testified at the Machner hearing, and when asked why he did not consult with an expert such as Nurse Donovan, he said that he did not know.

In adjudicating this claim, the Wisconsin Court of Appeals determined that even if Haldemann's trial counsel performed deficiently by failing to consult with an expert such as Nurse Donovan, his deficient performance did not result in prejudice. The court reasoned as follows:

> Here, the opinion of rebuttal witness Donovan was inconclusive. In particular, we note that upon cross-examination, Donovan qualified her opinion in light of the totality of Dana's injuries. For example, the prosecutor asked whether the scratches on Dana's back and the bruise on her breast could be consistent with nonconsensual sex. Donovan replied, "It could be consistent, yes. With some kind of trauma, yes. Violence that kind of thing, yes." The prosecutor also asked Donovan if all sexual assault victims have signs of injury. She explained:
>
>> [M]aybe half of the time. I think that has to do with . . . understanding the dynamics, because a perpetrator uses as much force as they need to render a victim . . . . [I]f there's a weapon as a threat . . . there might be no injury . . . because just the threat of the weapon was enough to render someone that says, I'm not going to resist . . . .

8

> The prosecutor asked Donovan about all of Dana's injuries in the context of the assault as reported; ultimately, the following exchange took place:
>
>> [Question:] When you put all of these things together, doesn't that make the case stronger that there's a sexual assault . . . each of the things could be caused by something else? But when you start putting them all together, doesn't that make the case stronger?
>>
>> [Answer:] I would agree with that.
>
> Donovan later testified that she felt Robertson overstated the certainty that some of the evidence provided regarding the occurrence of a sexual assault, but that she did not believe the facts were inconsistent with forced sexual intercourse.

State v. Haldemann, 2009 WL 2032346, at *5. Ultimately, the court concluded that the "inconclusive" testimony of Nurse Donovan did not give rise to a reasonable probability that the outcome of Haldemann's trial would have been different.

The Wisconsin Court of Appeals's reasoning was not contrary to any Supreme Court precedent, and it did not involve an unreasonable application of any such precedent. Nor was the court's decision based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. Therefore, Haldemann is not entitled to habeas relief based on his trial counsel's failure to consult with an expert such as Nurse Donovan.

Haldemann's remaining claim is that his trial counsel performed deficiently in failing to seek admission of evidence of Dana's having had consensual sex the night before the alleged assault. In Haldemann's view, this consensual sex might have been a contributing or alternative source of the injuries that Nurse Robertson observed. At the Machner hearing, Haldemann's trial counsel testified that he did not seek admission of this evidence because Wisconsin's rape-shield law prohibited its admission and he had no good-faith

9

basis for arguing that it should be admitted. The Wisconsin Court of Appeals concluded that trial counsel understood the relevant legal principles and made a reasonable legal judgment, and that therefore his failure to seek admission of the evidence was not constitutionally deficient. State v. Haldemann, 2009 WL 2032346, at *5–7. This conclusion was not contrary to, and did not involve an unreasonable application of, any Supreme Court precedent and was not based on an unreasonable determination of the facts. Therefore, Haldemann is not entitled to habeas relief on this claim.

### III.  CONCLUSION

For the reasons stated, **IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**. The Clerk of Court shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that petitioner has not made the showing required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

Dated at Milwaukee, Wisconsin, this 8th day of March, 2012.

s/_____
LYNN ADELMAN
District Judge